# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-CA-00727-COA

SHANNON WESTFALL AND JOHN WESTFALL                    APPELLANTS

v.

RANDY GOGGINS AND CARNES FRAMES,                         APPELLEES
INC.

| | |
|---|---|
| DATE OF JUDGMENT: | 04/18/2016 |
| TRIAL JUDGE: | HON. JAMES SETH ANDREW POUNDS |
| COURT FROM WHICH APPEALED: | PONTOTOC COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | WILLIAM O. RUTLEDGE, III |
| | LAURANCE NICHOLAS CHANDLER ROGERS |
| | VALARIE BLYTHE HANCOCK |
| ATTORNEYS FOR APPELLEES: | REBECCA B. COWAN |
| | JOSEPH WALTER GILL |
| NATURE OF THE CASE: | CIVIL - PERSONAL INJURY |
| DISPOSITION: | REVERSED AND REMANDED - 10/10/2017 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**GRIFFIS, P.J., FOR THE COURT:**

¶1.     Shannon and John Westfall appeal the circuit court's dismissal of their negligence claims based on discovery violations. This case considers whether the dismissal was appropriate under Mississippi Rule of Civil Procedure 37 and *Pierce v. Heritage Properties, Inc.*, 688 So. 2d 1385 (Miss. 1997). We find reversible error and remand for further proceedings.

FACTS

¶2.     On June 3, 2013, Shannon was involved in an automobile accident in Pontotoc,

Mississippi. Shannon's automobile was hit by a tractor trailer driven by Randy Goggins and owned by his employer, Carnes Frames, Inc. As a result of the accident, Shannon and her husband, John, commenced a civil action against Goggins and Carnes (the defendants). Shannon alleged that she "sustained serious physical injuries as a proximate result of the motor-vehicle accident" and has "undergone serious and continuous medical treatment for the injuries [she] sustained." John claimed that he "suffered a loss of consortium and companionship as a proximate result of the motor-vehicle accident."

¶3.     In discovery, Shannon provided the defendants with a medical authorization, she responded to interrogatories, and she was deposed. Thereafter, on September 15, 2014, the defendants filed a motion to dismiss that claimed that Shannon had made false representations in her discovery responses, which were willful and in bad faith. The defendants further argued that the only appropriate sanction for such discovery violations was the dismissal of the Westfalls' complaint with prejudice.

¶4.     On July 1, 2015, the circuit judge held a hearing on the motion to dismiss. At the hearing, the Westfalls' counsel moved and was granted leave to provide an affidavit from a medical provider to correct an inaccuracy in one of the medical records relied on by the defendants. The information was provided to the circuit judge in a timely manner, and it corrected an inaccuracy in the medical records.

¶5.     Eight months later, on April 26, 2016, the circuit court entered its findings of fact and conclusions of law. The circuit judge's order granted the motion to dismiss and dismissed

the Westfalls' complaint with prejudice. It is from this order that the Westfalls now appeal.

ANALYSIS

¶6. The question here is whether the circuit court committed reversible error in the decision to dismiss the Westfalls' complaint under Rule 37 and *Pierce.*

¶7. This Court must review the decision under an abuse-of-discretion standard. *Pierce*, 688 So. 2d at 1388. We may only reverse the dismissal if there is a "definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon [its] weighing of [the] relevant factors." *Id.*

¶8. In *Pierce*, the plaintiff was injured when a ceiling fan in her apartment fell from the ceiling onto her. *Id.* at 1387. During discovery and at trial, she concealed the fact that another person was present in the room when the ceiling fan fell. *Id.* at 1387-88. On numerous occasions, through extensive discovery, and in response to interrogation at the first trial, she maintained that she was alone when the accident occurred. *Id.* at 1387. After a new trial was granted, for other reasons, it was discovered that she had lied. *Id.* at 1388. The circuit court found that such a blatant lie, even though there was no prejudice to the defendants, was grounds to dismiss her case. *Id.*

¶9. The supreme court's analysis in *Pierce* provides us with the framework we must consider in this appeal:

> Pierce contends that the circuit court erred and abused its discretion by imposing the sanction of dismissal with prejudice, thereby barring her from any recovery for injuries caused when the ceiling fan fell on her. Specifically, the appellant argues that the trial court misapplied Mississippi Rule of Civil

3

Procedure 37(b)(2) by imposing the "death penalty" and dismissing her lawsuit.

The decision to impose sanctions for discovery abuse is vested in the trial court's discretion. The provisions for imposing sanctions are designed to give the court great latitude. The power to dismiss is inherent in any court of law or equity, being a means necessary to orderly expedition of justice and the court's control of its own docket. Nevertheless, the trial court should dismiss a cause of action for failure to comply with discovery only under the most extreme circumstances.

Such dismissals by the trial court are reviewed under an abuse-of-discretion standard. When this Court reviews a decision that is within the trial court's discretion, it first asks if the court below applied the correct legal standard. If the trial court applied the right standard, then this Court considers whether the decision was one of several reasonable ones [that] could have been made. This Court will affirm a trial court's decision unless there is a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon [its] weighing of [the] relevant factors.

*Pierce*, 688 So. 2d at 1388 (internal citations and quotation marks omitted). Of particular note, the supreme court expressed an important word of caution and admonition: "Nevertheless, the trial court should dismiss a cause of action for failure to comply with discovery *only under the most extreme circumstances*." *Id.* (emphasis added).

¶10.    *Pierce* began the "death penalty" line of cases. Since then, there have been a number of appellate decisions that have considered this issue. Recently, in *Kinzie v. Belk Department Stores, L.P.*, 164 So. 3d 974 (Miss. 2015), the supreme court addressed this very issue:

In *Pierce,* this Court held that dismissal was appropriate because the plaintiff had flat-out lied under oath about the existence of an eyewitness to the incident that had caused the plaintiff's alleged injuries and had "consistently obstructed the progress of the litigation by filing admittedly false responses to various discovery requests and by swearing to false testimony in depositions." [*Pierce*, 688 So. 2d] at 1390. This Court determined that dismissal was appropriate

4

because the plaintiff had acted in bad faith, and that any sanction other than "dismissal would virtually allow the plaintiff to get away with lying under oath." *Id.* at 1390-91. The Court noted, however, that it would remain very reluctant to affirm such a harsh sanction, and did so in that case only because it provided "the *paradigm* situation in which the plaintiff knowingly refused to be forthcoming and actively withheld the truth from the court and gave a *great deal* of perjured testimony." *Id.* at 1391 (emphasis added).

In other cases in which this Court has affirmed dismissal, the discovery violations were similarly egregious. In *Scoggins v. Ellzey Beverages, Inc.*, 743 So. 2d 990 (Miss. 1999), the plaintiff, who could perfectly recall the details of several aspects of her life for many years, completely failed to disclose several invasive medical procedures and doctors' visits that were relevant to her claim. The trial court in that case found that the plaintiff made an "apparently deliberate attempt to subvert the judicial process," and she presented "no credible explanation for the total lack of congruence between her testimony and her medical records." *Id.* at 994 [(¶18)]. This Court affirmed, again noting that this case presented a rare instance "where the conduct of a party is so egregious that no other sanction will meet the demands of justice." *Id.* at 997 [(¶36)].

More recently, in *Ashmore v. Mississippi Authority on Educational Television*, 148 So. 3d 977, 985 [(¶24)] (Miss. 2014), we affirmed a dismissal where the plaintiff had "lied by concealing a right-knee surgery and degenerative joint disease in his right knee." The plaintiff also had hidden the existence of "a subsequent left-knee injury or degenerative disc disease in his back, despite medical reports to the contrary." *Id.* Once again, the discovery violations that justified dismissal were clear and unequivocal falsehoods.

However, where the discovery violation at issue is less extreme and open to potential truthful interpretations, this Court will not hesitate to reverse a trial court's Rule 37 dismissal. In *Wood ex rel. Wood v. Biloxi Public School District*, 757 So. 2d 190, 193 [(¶11)] (Miss. 2000), the plaintiff responded to an interrogatory regarding the nature of his injuries by stating, "I no longer am able to enjoy tinkering with automobiles as the stooping, bending, and squatting are painful." After viewing undercover surveillance video of the plaintiff "walking normally, squatting, twisting, bending, and generally performing normal daily functions without any indication of impairment or pain," the trial court dismissed the plaintiff's case. *Id.* This Court reversed, finding that "the only discovery response [that] was contradicted by evidence

5

at the hearing on the motion to dismiss was one ambiguously worded response to one interrogatory question." *Id.* at 194 [(¶14)]. As the plaintiff's response indicated that he could still perform certain tasks, just with less enjoyment than before, the Court held that the defendants did not establish that the plaintiff "knowingly made false statements in discovery and it was certainly not established that the plaintiff had engaged in a *pattern* of such false responses." *Id.* (emphasis added). The Court held "that the alleged untruthfulness in Wood's interrogatories, if any, did not constitute a sufficiently egregious discovery violation such that no other sanction will meet the demands of justice." *Id.* at 195 [(¶18)].

We find the discovery violation in this case to be more similar to the alleged discovery violation in *Wood* than the unequivocally false and misleading discovery violations found in *Pierce*, *Scoggins*, and *Ashmore*. In *Wood*, the plaintiff stated that he could no longer enjoy certain activities as he could before being injured. Here, Kinzie stated that he could not perform several activities as he could before his injury. He was truthful when it came to his medical record and his medically diagnosed work restrictions. Kinzie indisputably was injured. He went to an emergency room immediately after his accident and, at that time, was diagnosed with central-disc protrusion, disc desiccation, and disc bulging. He underwent an invasive surgical procedure on his spine. The activity observed in the undercover video did not stray outside of his medical work restrictions, and it did not encompass any of the specific activities that he stated he no longer could perform. The trial court found this to be a discovery violation. While the trial court cannot be said to have been manifestly wrong in its determination that there was, in fact, a discovery violation, the severe sanction of dismissal amounts to clear, reversible error amounting to an abuse of discretion.

Kinzie did not blatantly lie about the existence of a witness, as did the plaintiff in *Pierce*, nor did he completely misrepresent years of medical history and procedures, as did the plaintiff in *Scoggins*, nor did he hide any other surgeries, as did the plaintiff in *Ashmore*. The Court finds no "total lack of congruence" between Kinzie's responses and his medical records, as the trial court found in *Scoggins*. *Scoggins*, 743 So. 2d at 994 [(¶18)]. Nor do we find this to be "the *paradigm* situation in which the plaintiff knowingly refused to be forthcoming and actively withheld the truth from the court and gave a *great deal* of perjured testimony" as this Court found in *Pierce*. *Pierce*, 688 So. 2d at 1391 (emphasis added). Instead, and similar to the plaintiff in *Wood*, Kinzie answered an interrogatory about the extent of his injuries in a way that the trial

6

court thought was misleading. And here, although the trial court found Kinzie's response to be false, the perceived falsehood arose in an isolated incident, and it certainly has not been established that Kinzie's statements in discovery indicate any kind of *pattern* of misleading or false responses.

Analogously, this Court has reversed a trial court's dismissal based on [Mississippi] Rule of Civil Procedure 41(b) where the trial court failed to consider lesser sanctions, including "fines, costs, or damages against plaintiff or his counsel, attorney disciplinary measures, conditional dismissal, dismissal without prejudice, and explicit warnings." *Am. Tel. & Tel. Co. v. Days Inn of Winona*, 720 So. 2d 178, [181-82 (¶17)] (Miss. 1998) (quotation omitted). Just as this Court found then, in this case, "it is not at all certain that lesser sanctions would have been futile in expediting the proceedings." *Id.* [at 182 (¶17)]. Although we do not find, as did the Court of Appeals, that the trial court abused its discretion when it determined that Kinzie had committed a discovery violation, we hold that the trial court erred when it dismissed the case completely as a result of that violation while paying mere lip service to the possibility and practicality of lesser sanctions.

. . . .

Dismissal is appropriate only under the most extreme circumstances and only where lesser sanctions will not suffice. *Pierce,* 688 So. 2d at 1388-89. This is not an extreme case, and lesser sanctions can deter misleading responses without dismissing Kinzie's claims altogether. A jury will watch this video, and that may influence its ultimate determination. But a jury ought to make that ultimate determination, not the trial judge. The discovery violation at issue is not sufficiently extreme to justify a full and final dismissal of the case. We therefore affirm that portion of the judgment of the Court of Appeals [that] held that dismissal with prejudice was not warranted. We reverse the Court of Appeals' finding that the trial court abused its discretion when it determined that Kinzie had committed a discovery violation. We reverse the judgment of the Circuit Court of the First Judicial District of Hinds County dismissing the case with prejudice, and we remand the case for trial.

*Kinzie*, 164 So. 3d at 977-80 (¶¶6-13).

¶11. Based on this governing authority, we examine the facts of this case. Shannon provided the following interrogatory responses:

INTERROGATORY NO. 7: Have you been involved in any type of accident or had any medical problem, either before or after the accident in question in this case, as a result of which you were seen or treated by a physician or other health-care provider in regard to any complaints or problems or parts of your body similar to the complaints, problems, and parts of your body involved in this lawsuit?

RESPONSE: In 2010, I slept wrong and had a muscle spasm in my left shoulder.  I was seen by Dr. [Brad] Scott at Creekmore Clinic, and I have not had any other problems until the accident.

INTERROGATORY NO. 8: If your answer to Interrogatory No. 8 [sic] is affirmative, for each and every such accident or medical problem, number and list the accident, medical problem, or injury, and state the date and details of the accident, the nature and type of the problem or injury, the names and addresses of any physicians, nurses, therapists, chiropractors, or other health personnel seen for treatment, the dates and duration of any period of hospitalization, the reasons or symptoms for which treatment was sought, the date and time treatment was sought, the manifestations of pain or injury which made [sic] to the physicians, nurses, therapists, chiropractors, or other health personnel, the exact type and duration of treatments given, and the effects of the treatments on the injury.

RESPONSE: Dr. Scott took x-rays, but nothing showed up. He gave me pain medication and a muscle relaxer.  The spasms went away and I have had no other problems until the accident.

. . . .

INTERROGATORY NO. 16: In your complaint you allege that you "sustained serious physical injuries" and "have undergone serious and continuous medical treatment for the injuries" as a result of the accident.  State each and every fact on which you base this allegation and, for each and every such fact, state the name, residence address, residence telephone number, business address, and business telephone number of any and all persons who have knowledge of the fact.

RESPONSE: I suffered a torn right rotator cuff injury which has required surgery.  [There] is also a possible tear to my left rotator cuff.

8

¶12.    Shannon then testified to the following in her deposition:

Q.    Tell me what kind of injuries you sustained in the accident?

A.    I tore my right rotator cuff, and I had to have surgery to repair it twice. And I've had from July 22nd to almost Christmas, three days a week of physical therapy.

Q.    I asked you in Interrogatory No. 7 had you had any other accident or any kind of medical problems associated with the body that was – parts of your body that were hurt in the accident. And you said, "In 2010, I slept wrong and had a muscle spasm in my left shoulder."

A.    Yes, ma'am.

Q.    Did he – did he – I think you told – in another answer, you told me he gave you, like, a muscle relaxer?

A.    Yes, ma'am.

Q.    And what else did he give you?

A.    That was probably it, and maybe a pain – you know, a couple of pain pills, but that was it.

Q.    And so that's the only injury you had sustained to either one of your shoulders before the accident.

A.    Yes, ma'am.

Q.    And you have never seen a physician about the shoulders before.

A.    No, ma'am.

. . . .

Q.    And you hadn't fallen and hurt your shoulder or –

A.    No.

9

Q.      – thrown a bale of hay and, you know, popped your shoulder or anything like that?

A.      No, ma'am. I'm not – I'm not into manual labor, so no, ma'am.

Q.      And you've not gotten any other prescriptions other than that in 2010 for your shoulder.

A.      I've been on anxiety medicine and sleeping medicine.

Q.      No. I mean for pain in your shoulders.

A.      No, ma'am. No, ma'am.

. . . .

Q.      Here's your – you said when your left shoulder – you slept wrong, and he did prescribe you muscle relaxers, but that's the only medication you've received for shoulder pain?

A.      That I can recall of.

. . . .

Q.      Prior to the accident, had you had any [x]-rays or MRIs or any kind of diagnostic procedures on either one of your shoulders?

A.      I don't recall prior to the accident.

¶13.    To support the motion to dismiss, the defendants argued that Shannon's actual pre-existing medical history was "contrary" to her interrogatory answers and deposition testimony. The defendants contend that Shannon's medical records show that she complained numerous times to her physicians about pain in both of her shoulders prior to the accident at issue and that, prior to the accident, she had x-rays of her shoulders and had received numerous prescriptions for shoulder pain. They cite the following medical records:

10

2/1/10 – Mrs. Westfall sought treatment at Creekmore Clinic for an "injury to her left shoulder that occurred several days ago." According to this medical record:

> The patient was wrestling and was injured. The patient cannot describe the mechanism of injury only stating there was immediate pain in the left shoulder. The discomfort is moderate to severe in intensity and has an aching quality. It does not radiate. She also injured her right thumb.

Her physician diagnosed her with a "Shoulder Contusion," ordered two x-rays of the shoulder, and prescribed her Darvocet-N and Flexeril.

9/9/10 – Mrs. Westfall sought treatment at North Mississippi Medical Center, where the [e]mergency[-r]oom [p]hysician diagnosed her with lower[-]back pain and left joint and shoulder pain. She was prescribed a Medrol Dose Pack and Flexeril.

10/3/12 – Mrs. Westfall sought treatment at North Mississippi Medical Center, complaining of back, neck, and left shoulder pain that she had been experiencing ever since she suffered a fall on September 4, 2012. She also complained of right shoulder pain, experienced tenderness in the AC joint of her right shoulder, and received an x-ray of the right shoulder. She was prescribed Lortab, Muscle Relax Robaxin.

2/25/13 – Mrs. Westfall sought treatment at Acute Care & Family Clinic of Pontotoc, complaining of, inter alia, "left shoulder pain" from an "[i]njury from 2 to 3 years ago." She was prescribed Meloxicam for pain.

¶14. The defendants argue that these records show that, prior to the June 3, 2013 accident at issue, Shannon only sought medical attention regarding her left shoulder on one occasion in 2010, when she had a muscle spasm after sleeping wrong. This, they contend, "is clearly false." The defendants argue that Shannon's prior medical records demonstrate that she actually sought medical attention for pain in her left shoulder on at least four occasions within just four years preceding the accident. They also argue that these medical records

11

indicate that her testimony that, prior to the accident, she had received prescription medications for shoulder pain on only one occasion in 2010 "also is clearly false."

¶15. The defendants then offer the following pre-accident medical records about Shannon's right shoulder:

> 3/4/11 – Mrs. Westfall sought treatment at North Mississippi Medical Center with complaints of pain in her right shoulder (and other areas of her body) following a fall from the steps of her deck.
>
> 8/18/11 – Mrs. Westfall sought treatment at Pontotoc Hospital for "throbbing pain" in her right neck and right shoulder after she felt a "pop when putting clothes in [the] dryer." She was prescribed Lortab.
>
> 10/3/12 – As noted above, Mrs. Westfall sought treatment at North Mississippi Medical Center, complaining of back, neck, and left shoulder pain ever since she experienced a fall on September 4, 2012. She also complained of right shoulder pain, experienced tenderness in the AC joint of her right shoulder, and received an x-ray of the right shoulder. She was prescribed Lortab, Muscle Relax Robaxin.

From this, the defendants argue that Shannon's testimony that, prior to the accident, she never sought medical attention regarding her right shoulder "is clearly false." Her prior medical records demonstrate that she actually sought medical attention for pain in her right shoulder on at least three separate occasions within just the three years preceding the accident.

¶16. In response to the allegations of false statements, Shannon argues that none of these injuries were related to the injury caused by the accident and for which she sued for damages. There was no doubt that Shannon was injured in the accident. She had not had a torn rotator cuff before the accident and did have a torn rotator cuff after the accident. She also asserted

that each of these purported medical issues was simply diagnosed as a bruise.

¶17. The defendants contend that this case is more like *Scoggins*. In *Scoggins*, Mildred Scoggins lied about a previous surgery, thirty-five visits to a doctor, and a myelogram for lower-back pain, which the court described as an unusually painful test that involves a needle being inserted into the patient's spine to inject dye. *Scoggins,* 743 So. 2d at 993 (¶14).

¶18. We disagree. The defendants allege that Shannon "lied" because she did not specifically identify injuries that occurred to other parts of her body, which were not related to this injury. It is important to note that all of this information was obtained from her medical provider, Dr. Scott at Creekmore Clinic, whom she readily identified. Shannon provided a medical authorization,[1] and the defendants obtained the complete medical records of Dr. Scott and became aware of the fact that Shannon had been treated by Dr. Scott for other problems, including shoulder issues, that Shannon contends were not related to the injuries or damages from the accident in question. There is simply no comparison between Shannon's discovery answers and those in *Scoggins*.

¶19. When we compare the facts here to the earlier cases, we conclude that Shannon "did

---

[1] We recognize that this Court, in *Conklin v. Boyd Gaming Corp.*, 75 So. 3d 589, 595 (¶16) (Miss. Ct. App. 2011), held that submitting medical releases does not remedy repeatedly providing false answers during discovery. Shannon does not make this argument. However, it is important that Shannon's provision of medical authorization to the defendants in discovery does weigh against a finding that Shannon made an intentional misrepresentation or blatantly lied about her medical history. In fact, the medical authorizations gave the defendants access to the original source of records and subjected her to possible impeachment or an attack on her credibility.

not blatantly lie about the existence of a witness, as did the plaintiff in *Pierce*, nor did [s]he completely misrepresent years of medical history and procedures, as did the plaintiff in *Scoggins*, nor did [s]he hide any other surgeries, as did the plaintiff in *Ashmore*." *Kinzie*, 164 So. 3d at 978 (¶11).

¶20.    The record indicates that there was some confusion between the injuries to her left and right shoulders.  But, this confusion does not lead to the conclusion that Shannon made intentional and deceitful misrepresentations.  We simply do not find evidence to support the conclusion that Shannon intentionally misled or blatantly lied in her discovery responses. Unlike in *Pierce*, Shannon's interrogatory responses and the reasonably expected discovery efforts of the defendants led to the medical records that may contradict Shannon's interrogatory responses or deposition testimony.  Certainly, the medical records may be offered to attack Shannon's credibility at trial and to accurately present evidence of Shannon's prior medical history and condition.  Under these circumstances, a lesser sanction of attorney's fees and costs associated with obtaining the medical records would have been an appropriate sanction, if any.  Dismissal is certainly not.

¶21.    Anytime a defendant asks for dismissal of the action for a discovery violation, the trial judge and this Court must begin with the important admonition in *Pierce* – dismissal is appropriate "only under *the most extreme circumstances*" and only where lesser sanctions will not suffice.  *Pierce,* 688 So. 2d at 1388-89 (emphasis added).  This is simply not an extreme case.

14

¶22. Therefore, we find a definite and firm conviction that the circuit judge committed a clear error of judgment in the dismissal of this action. Because of this finding, the remaining issues are moot and will not be addressed. For the reasons set forth above, we reverse the judgment of dismissal and remand this case to the circuit court for further proceedings consistent with this opinion.

¶23. **REVERSED AND REMANDED.**

**LEE, C.J., FAIR AND WILSON, JJ., CONCUR. GREENLEE AND WESTBROOKS, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. IRVING, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY BARNES AND CARLTON, JJ.; GREENLEE AND WESTBROOKS, JJ., JOIN IN PART.**

**IRVING, P.J., DISSENTING:**

¶24. The majority reverses and remands the judgment of the Circuit Court of Pontotoc County, dismissing the Westfalls' complaint against Goggins and Carnes because Shannon failed to disclose, during discovery, that prior to the accident between her and Goggins she had suffered complaints and had had problems with parts of her body similar to the complaints, problems, or parts of her body that were the subject of her lawsuit against Goggins and Carnes. I dissent because I believe that Shannon's actions fall within the parameters of conduct, as articulated by the Mississippi Supreme Court, that permit a trial judge to dismiss a plaintiff's complaint when the plaintiff has deliberately attempted to subvert the judicial process by willfully refusing to be forthcoming with information that is required to be disclosed during the discovery process. For the reasons discussed below, I

15

would affirm the judgment of the circuit court.

¶25.   Shannon and Goggins were involved in a motor-vehicle accident on June 3, 2013. Shannon was driving a 2003 Toyota Avalon, and Goggins was driving a 1994 Freightliner tractor trailer that was owned by his employer, Carnes.  Shannon alleged that Goggins was at fault and that she was injured and suffered damages as a result of Goggins's negligence. Therefore, she sued Goggins and Carnes, alleging that Carnes was also liable under the theory of respondeat superior.

¶26.   Goggins and Carnes submitted interrogatories to Shannon and took her deposition to ascertain the extent and nature of her injuries attributable to the accident.  Among the interrogatories submitted by Goggins and Carnes and responses given by Shannon were these:

> INTERROGATORY NO. 7: Have you been involved in any type of accident or had any medical problem, either before or after the accident in question in this case, as a result of which you were seen or treated by a physician or other health care provider in regard to any complaints or problems or parts of your body similar to the complaints, problems, and parts of your body involved in this lawsuit?
>
> RESPONSE: In 2010, I slept wrong and had a muscle spasm in my left shoulder.  I was seen by Dr. Scott at Creekmore Clinic, and I have not had any other problems until the accident.
>
> INTERROGATORY NO. 8: If your answer to Interrogatory No. 8 [sic] is affirmative, for each and every such accident or medical problem, number and list the accident, medical problem, or injury, and state the date and details of the accident, the nature and type of the problem or injury, the names and addresses of any physicians, nurses, therapists, chiropractors, or other health personnel seen for treatment, the dates and duration of any period of hospitalization, the reasons or symptoms for which treatment was sought, the

16

date and time treatment was sought, the manifestations of pain or injury which made [sic] to the physicians, nurses, therapists, chiropractors, or other health personnel, the exact type and duration of treatments given, and the effects of the treatments on the injury.

RESPONSE: Dr. Scott took x-rays, but nothing showed up.  He gave me pain medication and a muscle relaxer.  The spasms went away and I have had no other problems until the accident.

****

INTERROGATORY NO. 16: In your complaint you allege that you "sustained serious physical injuries" and "have undergone serious and continuous medical treatment for the injuries" as a result of the accident.  State each and every fact on which you base this allegation and, for each and every such fact, state the name, residence address, residence telephone number, business address, and business telephone number of any and all persons who have knowledge of the fact.

RESPONSE: I suffered a torn right rotator cuff injury which has required surgery.  [There] is also a possible tear to my left rotator cuff.

¶27.   Excerpts from Shannon's deposition reflect the following colloquy between Shannon and Goggins and Carnes's attorney:

Q.     Tell me what kind of injuries you sustained in the accident?

A.     I tore my right rotator cuff, and I had to have surgery to repair it twice. And I've had from July 22nd to almost Christmas, three days a week of physical therapy.

Q.     I asked you in Interrogatory No. 7 had you had any other accident or any kind of medical problems associated with the body that was – parts of your body that were hurt in the accident.  And you said, "In 2010, I slept wrong and had a muscle spasm in my left shoulder."

A.     Yes, ma'am.

Q.     Did he – did he – I think you told – in another answer, you told me he

17

gave you, like, a muscle relaxer?

A.    Yes, ma'am.

Q.    And what else did he give you?

A.    That was probably it, and maybe a pain – you know, a couple of pain pills, but that was it.

Q.    And so that's the only injury you had sustained to either one of your shoulders before the accident.

A.    Yes, ma'am.

Q.    And you have never seen a physician about the shoulders before.

A.    No, ma'am.

* * * *

Q.    And you hadn't fallen and hurt your shoulder or –

A.    No.

Q.    – thrown a bale of hay and, you know, popped your shoulder or anything like that?

A.    No, ma'am. I'm not – I'm not into manual labor, so no, ma'am.

Q.    And you've not gotten any other prescriptions other than that in 2010 for your shoulder.

A.    I've been on anxiety medicine and sleeping medicine.

Q.    No. I mean for pain in your shoulders.

A.    No, ma'am. No, ma'am.

* * * *

18

Q. Here's your – you said when your left shoulder – you slept wrong, and he did prescribe you muscle relaxers, but that's the only medication you've received for shoulder pain?

A. That I can recall of.

\* \* \* \*

Q. Prior to the accident, had you had any [x]-rays or MRIs or any kind of diagnostic procedures on either one of your shoulders?

A. I don't recall prior to the accident.

¶28. Shannon's medical records tell a different story about her medical history—with respect to her shoulders—prior to the accident. As shown by her responses to the interrogatories and her deposition testimony, Shannon identified only one incident regarding a problem with her left shoulder, and *did not identify any pre-existing conditions or problems* regarding her right shoulder, the one alleged to have been injured in the accident. Yet her medical records reflect the following:

*Undisclosed Pre-accident Left Shoulder Medical History*

¶29. On February 1, 2010, Shannon sought treatment at Creekmore Clinic for an injury to her right shoulder and an injury to her left shoulder that occurred several days earlier when she was wrestling. Her physician diagnosed her with a shoulder contusion, ordered two x-ray views of the shoulder, and prescribed Darvocet-N and Flexeril.

¶30. On September 9, 2010, Shannon sought treatment at the emergency room of North Mississippi Medical Center. The emergency-room physician diagnosed her with back pain and left joint and shoulder pain and prescribed a Medrol Dose Pack and Flexeril.

19

¶31.  On October 3, 2012, Shannon sought treatment at North Mississippi Medical Center, complaining of back, neck, and left-shoulder pain. She indicated that she had been suffering with the pain ever since she experienced a fall approximately a month earlier. She was prescribed Lortab and the muscle relaxer Robaxin.[2]

¶32.  On February 25, 2013, just a little over three months prior to the accident, Shannon sought treatment at the Acute Care & Family Clinic of Pontotoc, complaining of, among other things, left-shoulder pain, and pain in her right shoulder from an injury that she had sustained two to three years earlier. She was prescribed Meloxicam for pain.

*Undisclosed Pre-accident Right Shoulder Medical History*

¶33.  On March 4, 2011, following a fall from the steps of her deck, Shannon sought treatment at North Mississippi Medical Center for pain in her right shoulder and other areas of her body. Then, on August 18, 2011, Shannon sought treatment at Pontotoc Hospital for throbbing pain in the right side of her neck and right shoulder after she felt a pop while putting clothes in a dryer. She was prescribed Lortab.

¶34.  Shannon's "records from [a] visit to the Creekmore Clinic on [March 21, 2012,] indicate that she had a prior surgery to repair a right rotator cuff and that she had a history of rotator cuff syndrome of the shoulder."[3] On October 3, 2012, Shannon presented to North

---

[2] On this occasion, Shannon also complained of right-shoulder pain. Later in this opinion, I discuss the undisclosed right-shoulder problems and complaints.

[3] The circuit court did not consider this medical record in deciding that dismissal of Shannon's complaint was appropriate. Later in this dissent, I discuss the reasons for the court's decision not to consider this record.

Mississippi Medical Center, complaining of right-shoulder pain and of experiencing tenderness in the AC joint of her right shoulder. Her right shoulder was x-rayed, and she was prescribed Lortab and the muscle relaxer Robaxin. Note, in my earlier discussion of the undisclosed, left-shoulder problems and complaints, Shannon indicated that she had been having the pain in her neck and left shoulder ever since suffering a fall a few months earlier. It is not clear whether she also had been having the right-shoulder pain and the tenderness of the AC joint of her right shoulder ever since the earlier fall.

¶35. As noted earlier, on February 25, 2013, Shannon sought treatment at the Acute Care & Family Clinic of Pontotoc, complaining of pain in her right shoulder from an injury that she had sustained two to three years earlier. She was prescribed Meloxicam for pain.

¶36. Additionally, the record reflects that on June 24, 2013, which was after the accident in question, Shannon visited Dr. Thomas A. Shands. His medical records indicate that Shannon presented complaining of right-shoulder pain from a motor-vehicle accident, and she indicated that she had "***no prior history of problems with shoulders***." (Emphasis added).

¶37. Returning to Shannon's undisclosed, pre-accident medical history, I mentioned earlier that, in determining that dismissal was appropriate, the circuit court did not consider Shannon's medical record of March 21, 2012, that indicated she had had surgery to repair a rotator cuff, and a history of rotator cuff syndrome of the shoulder. That was because Shannon's attorney said that was an erroneous entry, and he offered to provide information to prove his contention. The record reflects the following colloquy between the circuit court

21

and Shannon's attorney on this point:

> THE COURT: And you're saying her prior surgery by the Creekmore Clinic, that that didn't happen, even though the medical records show that she had a prior rotator cuff surgery back on March the 12th, 2012?
>
> [COUNSEL]: That is exactly what I'm saying, Your Honor.
>
> THE COURT: ***Have you got up with them since then to enter some kind of affidavit that they're wrong***? And certainly they could easily go back and see if she had surgeries or not.
>
> [COUNSEL]: That's correct, Your Honor. No, sir, I don't have that. But if -- I'll be -- I know it would be outside the date of this motion hearing, but if you would give me one week I can have that for Your Honor to supplement this hearing. If you'd allow me the time to do that, I could certainly do it.
>
> THE COURT: I'll consider it.

(Emphasis added).

¶38.   Later, Shannon's counsel produced the following letter from Dr. Creekmore, along with what was termed an audit-trail document:[4]

> To Whom It May Concern:
>
> This is a note to explain an apparent discrepancy in the records on Ms. Shannon Westfall, a patient at Creekmore Clinic. Her medical records show, under past medical history, that she had [a] repair of [a] rotator cuff[,] and rotator cuff syndrome of the shoulder. These were present in her progress notes of March 2012 by Dr. Scott but were not in the progress note of Candace McGreger in October of 2012.

---

[4] The audit-trail document has been retyped for clarity and is attached to this dissent as an appendix.

22

I am enclosing an audit that indicates when an item is inserted into a medical record, as well as who inserted it. It shows Dr. Brad Scott inserted the rotator cuff repair and rotator cuff shoulder syndrome October 7, 2013. Dr. Scott signed his medical record and these two progress notes on January 2, 2014.

This will explain the discrepancy between the two progress notes. This can occur when we review or make corrections in our medical records. Fortunately, there is an audit trail which explains the chronology of these corrections.

If you have any further questions, please call.

Sincerely,

Samuel J. Creekmore, M.D.

¶39. Dr. Creekmore's letter and the audit-trail document speak for themselves, and I will not comment on whether they adequately explain the discrepancy. I simply note that Dr. Creekmore's letter and the audit-trail document are not the affidavit that Shannon's counsel seemingly promised the circuit court during the colloquy quoted earlier in this dissent. Having said this, I should note that the medical records of Dr. Johnny H. Mitias, the surgeon who performed the rotator cuff repair after the accident, are silent as to whether Shannon had had a previous surgery for repair of a rotator cuff.

¶40. Before specifically addressing the majority's position, I make the following observations from the facts discussed earlier: first, it cannot be legitimately contended that the questions asked of Shannon were ambiguous and that Shannon did not understand them or that her responses are "open to potential truthful interpretations." Second, Shannon's response to Interrogatory No. 7—that she had not had any problems with her shoulders since

23

"sleeping wrong" and suffering muscle spasms in her left shoulder in 2010—is not only false, but also shows, without question, that she understood that she was being asked about pre-accident problems generally with her shoulders, not just about injuries related to the accident. Third, her interrogatory response and deposition answer that she had not received any prescriptions for pain for her shoulders since receiving a prescription in 2010 when "she slept wrong," is a patent untruth. Fourth, Shannon failed to disclose that she had been treated for shoulder pain during the three years immediately prior to the accident by various medical providers, including Dr. Creekmore, Acute Care & Family Clinic of Pontotoc, and North Mississippi Medical Center.

¶41. I now turn to a discussion of the majority's position. I note that the majority seems to recognize that we are to review the circuit court's decision under an abuse-of-discretion standard and that we must affirm the decision of the circuit court unless we possess a definite and firm conviction that the circuit court committed a clear error of judgment in the conclusion it reached upon its weighing of the relevant factors. *See Ashmore v. Miss. Auth. on Educ. Television*, 148 So. 3d 977, 981-82 (¶¶10-11) (Miss. 2014). However, I am not sure that the majority fully recognizes that as we review the trial court's decision, we must also consider "whether the decision was one of several reasonable ones [that] could have been made." *Id*. at 985 (¶26). I readily admit that our caselaw makes clear that the dismissal of a plaintiff's complaint for failure to comply with discovery should be dismissed "only under the most extreme circumstances," when a plaintiff has "knowingly refused to be forthcoming

24

and actively withheld the truth from the court," or given "clear and unequivocal falsehoods." *Kinzie*, 164 So. 3d at 977-78 (¶¶5-8). I believe Shannon is guilty of each of these transgressions.

¶42. First, the majority seems to suggest that because Goggins and Carnes were able to obtain all of the undisclosed information via the medical authorization that Shannon provided, she was somehow forthcoming, therefore, making her conduct less extreme. In taking this position, the majority recognizes that a plaintiff's submission of a medical release does not relieve the plaintiff of the obligation to give full and truthful discovery. Yet, the majority says, without citing any authority, that "Shannon's provision of medical authorization to [Goggins and Carnes] in discovery does weigh against a finding that Shannon made an intentional misrepresentation or blatantly lied about her medical history." Maj. Op. at n.1. Nothing supports this proposition in the cases cited in the majority opinion, where the Mississippi Supreme Court affirmed dismissals by the trial court.

¶43. Second, the majority says:

> The record indicates that there was some confusion between the injuries to her left and right shoulders. But, this confusion does not lead to the conclusion that Shannon made intentional and deceitful misrepresentations. We simply do not find evidence to support the conclusion that Shannon intentionally misled or blatantly lied in her discovery responses.

Maj. Op. at (¶20). I do not know what to make of this statement by the majority. If the majority had not published the relevant interrogatories, Shannon's responses to them, relevant excerpts from her deposition testimony, and her undisclosed records, I would be

25

tempted to say, even though it may sound paradoxical, that we read different records. Since we did not, I am left to ponder, without explanation, how the majority arrived at its conclusion, for Shannon "presented no credible explanation for the total lack of congruence between her testimony [and her responses to the interrogatories] and her medical records." *Kinzie*, 164 So. 3d at 978 (¶7) (internal quotation marks omitted). Moreover, there was no confusion between the injuries to Shannon's left and right shoulders. Certainly, nothing in the record supports this statement by the majority. Shannon was clear that she had suffered only one injury to one shoulder and that was to her left shoulder. Further, even if there had been some confusion, which there was not, Shannon was required by the interrogatories to disclose problems and/or injuries with and to both shoulders.

¶44. Third, in an attempt to show a lack of comparison between the facts in today's case and those in *Pierce*, *Scoggins*, and *Ashmore*, the majority, quoting *Kinzie*, states:

> When we compare the facts here to the earlier cases, we conclude that Shannon "did not blatantly lie about the existence of a witness, as did the plaintiff in *Pierce*, nor did she completely misrepresent years of medical history and procedures, as did the plaintiff in *Scoggins*, nor did she hide any other surgeries, as did the plaintiff in *Ashmore*."

Maj. Op. at (¶19) (quoting *Kinzie*, 164 So. 3d at 978 (¶11)). I am flummoxed by the majority's reasoning. Our caselaw does not hold that a plaintiff's case can be dismissed only if the plaintiff has lied about the existence of a witness, completely misrepresented years of medical history and procedures, or hidden other surgeries. Each case turns on its own facts. What is always under scrutiny is the plaintiff's actions in the particular case, whether it is

26

lying about the existence of a witness, the nondisclosure of prior surgeries, or blatantly lying about some other relevant fact or facts. As noted earlier in this dissent, the plaintiff here lied about many things and was not forthcoming about the physicians and medical providers that she had seen for problems related to her shoulders, the exact part of her body that she claimed had been injured in the accident that was the subject of her complaint. And Shannon capped her lies when she saw Dr. Shands after the accident and relayed that she had no history of shoulder problems. It is obvious that this false representation to Dr. Shands was for the sole purpose of obtaining a medical opinion that the rotator cuff tear occurred in the accident, although it may have occurred during some of the numerous other shoulder injuries that Shannon had suffered.

¶45. Here, the violations are similar to those that supported dismissal of the action in *Scoggins*, 743 So. 2d at 995 (¶18). In spite of the fact that Carnes was in possession of Shannon's medical records,[5] Shannon failed to identify her previous medical history when prompted. In her interrogatory responses, Shannon identified only one incident regarding a problem with her left shoulder, and did not identify any pre-existing conditions or problems regarding her right shoulder, the shoulder alleged to have been injured in the accident. Further, in her deposition, she testified about the problem with her left shoulder only, despite the fact that there were eight other instances in which her medical records showed that she

---

[5] *See Conklin v. Boyd Gaming Corp.*, 75 So. 3d 589, 595 (¶16) (Miss. Ct. App. 2011) (holding that simply submitting medical releases does not remedy repeatedly providing false answers during discovery).

had sought medical treatment for pain in both her left and right shoulders—four regarding the left shoulder and four regarding the right shoulder. This number excludes the March 21, 2012 medical record entry regarding her right shoulder that the trial judge did not consider.

¶46. In *Pierce*, 688 So. 2d at 1389, the Mississippi Supreme Court outlined the following four considerations to guide trial courts in the exercise of their discretion to dismiss vel non a case for a discovery violation:

> [(1)] First, dismissal is authorized only when the failure to comply with the court's order results from wil[l]fulness or bad faith, and not from the inability to comply. [(2)] Dismissal is proper only in situation[s] where the deterrent value of Rule 37 cannot be substantially achieved by the use of less drastic sanctions. [(3)] Another consideration is whether the other party's preparation for trial was substantially prejudiced. [(4)] Finally, dismissal may be inappropriate when neglect is plainly attributable to an attorney rather than a blameless client, or when a party's simple negligence is grounded in confusion or sincere misunderstanding of the court's orders.

(Citation omitted).

¶47. With the breadth of Shannon's misrepresentations, in what I believe was bad faith as she "knowingly refused to be forthcoming and actively withheld the truth from the court," it is my opinion that the trial court was correct in dismissing the case as the appropriate sanction under Rule 37. *Kinzie*, 164 So. 3d at 977 (¶6). As to the effect of any prejudice to Carnes, I agree with the trial court's statement that "[i]t would be ridiculous to allow a party who completely thwarts discovery to escape penalty simply because it could not be proven that other litigants were in fact deceived by such misconduct or actually relied upon [it]." (Quoting *Pierce*, 688 So. 2d at 1390). The failure to disclose eight out of nine instances in

which she had been treated by a physician for problems with her shoulders was a blatant disregard for her discovery obligations, worthy of the dismissal of her complaint. Therefore, I dissent. I would affirm the judgment of the circuit court dismissing the Westfalls' complaint.

**BARNES AND CARLTON, JJ., JOIN THIS OPINION; GREENLEE AND WESTBROOKS, JJ., JOIN THIS OPINION IN PART.**

APPENDIX

Creeekmore Clinic PLLC
Patient History
Patient ID: 25268; User: ALL; Date Range: 01/01/12 - 07/02/2015

## Past Medical History

| History Date/Time | Patient ID | User | Action | Disease Name | Notes | Date Onset |
|---|---|---|---|---|---|---|
| 10/07/2013 10:02AM | 25268 | bscott | Inserted | Rotator Cuff Syndrome of Shoulder | | |
| 11/18/2013 10:35AM | 25268 | bscott | Inserted | ADHD | | |
| 11/18/2013 10:35AM | 25268 | bscott | Inserted | Anxiety Disorder, Generalized | | |
| 5/1/2015 9:29AM | 25268 | kmoss | Inserted | Essential Hypertension | | 05/01/2015 |
| 5/1/2015 9:29AM | 25268 | kmoss | Inserted | Otalgia | | 05/01/2015 |
| 5/1/2015 9:29AM | 25268 | kmoss | Inserted | Panic Disorder | | 05/01/2015 |

## Past Surgical History

| History Date/Time | User | Patient ID | Action | Procedure Name | Notes | Date |
|---|---|---|---|---|---|---|
| 10/7/2013 10:01AM | bscott | 25268 | Inserted | Repair of Rotator Cuff, Right | | |
| 3/21/2012 3:02PM | cjones | 25268 | Inserted | Tubal Ligation | | |
| 3/21/2012 3:02PM | cjones | 25268 | Inserted | C-section | | |

## Past Social History

| History Date/Time | User | Patient ID | Action | Finding | Status | Age Start/ Age Stop | Amount Used | Notes |
|---|---|---|---|---|---|---|---|---|
| 10/26/2012 2:39PM | jrucker | 25268 | Deleted | Nonsmoker | | / | | |
| 10/26/2012 2:39PM | jrucker | 25268 | Inserted | Tobacco | | / | | |
| 10/26/2012 2:39PM | jrucker | 25268 | Updated | Tobacco | 4 | / | | |
| 11/18/2013 10:37PM | bscott | 25268 | Inserted | Alcohol | | / | | |
| 11/18/2013 10:37PM | bscott | 25268 | Updated | Alcohol | 4 | / | | |

30